IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MARQUISE D. ANDERSON                                           PLAINTIFF

V.                                        NO. 13-5257

BENTON COUNTY DETENTION CENTER,
NURSE DARLA WATSON, NURSE GAIL
HARTGRAVES, and BRANDON JARNAGAN                              DEFENDANTS

**MAGISTRATE JUDGES REPORT AND RECOMMENDATION**

This is a civil rights action filed by the Plaintiff, Marquise D. Anderson, pursuant to 42

U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis.*

Plaintiff is currently incarcerated in Benton County Detention Center (BCDC). The

events at issue in this case occurred while Plaintiff was in pre-trial status at the BCDC from

September 23, 2013 to December 22, 2013. Specifically, Plaintiff maintains that he was

subjected to excessive force by Defendant  Brandon Jarnagan on September 23, 2014, after

being engaged in a fight with another inmate, and was denied proper medical treatment by

Defendants Nurse Watson and Nurse Hartgraves, for injuries sustained as a result of the

excessive force.

Defendants have filed a motion for summary judgment. (Doc. 34).  On September 29,

2014, a hearing was held to allow the Plaintiff to respond to the summary judgment motion by

testifying.

I.    **Background:**

A.    **Plaintiff's Version:**

According to the Plaintiff's testimony at the hearing, on September 23, 2013, Plaintiff

and inmate Eric Helms got into an argument in the day room after dinner, because inmate Helms thought Plaintiff was supposed to give him his peanut butter tray and Plaintiff gave it to someone else. Inmate Helms asked Plaintiff to speak with him in a corner. Plaintiff went to speak with him, and Helms started using foul language toward Plaintiff. Plaintiff started walking away and also started using foul language. Helms came up behind Plaintiff and said "what's up," to which Plaintiff replied "what's up," and the next thing Plaintiff knew, Helms hit him. Plaintiff again tried to walk away, and Helms hit him again. At that point, a fight ensued between them. After the fight continued for a few seconds, Defendant Jarnagan came into the day room and told everyone to get on the ground. Plaintiff did not get on the ground because Helms was still going after him aggressively, and Plaintiff did not want to get hurt further.  Defendant Jarnagan then grabbed Plaintiff by the shirt and pulled him toward him, stepped back, and put his weight behind Plaintiff and slammed him into a metal stool, with Plaintiff going to the ground. According to Plaintiff, Defendant Jarnagan "swung me down."  Plaintiff testified that he was not injured from the fight with Helms, but was injured when Defendant Jarnagan swung him to the ground and he hit the metal stool. After Plaintiff hit the stool, he was dazed and had to have help getting up, and Defendant Jarnagan helped him up from the floor.

Approximately five to ten minutes after the incident, Plaintiff was taken to the ministry room and then to the nurse's station. Photographs of Plaintiff's face were taken approximately twenty to twenty-five minutes after the incident.[1] At the nurse's station, Plaintiff told Nurse Hartgraves that he was having dizziness and blurry vision. She told Plaintiff it would pass and that it was not that serious. She gave Plaintiff some Aleve and told him not to blow his nose.

---

[1]A review of the pictures reflects some redness and swelling of Plaintiff's right upper forehead. (Plaintiff's Ex. 1 and 2).

Nurse Hartgraves also told Plaintiff to notify the staff if things got worse. Plaintiff did not ask to be taken to the hospital at that time. Later that evening, in his cell, Plaintiff had a seizure and Deputy Chavez came to his room. When Plaintiff woke up, Deputy Chavez was holding Plaintiff's shoulders. Plaintiff told Deputy Chavez that he had been spitting up blood clots. Depute Chavez sent Plaintiff to the ministry room and said he would check with the nurse. Plaintiff was then taken to the nurse's station, and he told Nurse Hartgraves he had been spitting up blood clots and thought he had a seizure. At that time, Plaintiff asked if he could go to the hospital. She said she did not think he needed to, but would check with the doctor.  Plaintiff was then escorted back to his cell and the next day, on September 24, 2013, at around 4:51 pm, Plaintiff was taken to the hospital.

While at the hospital, a CT scan of Plaintiff's facial bones revealed that Plaintiff had minimally displaced/depressed and comminuted fractures of the anterior, lateral and superior wall of the right maxillary sinus, a small amount of blood products in the right maxillary sinus, and mild mucosal disease was otherwise noted.  A CT of Plaintiff's head revealed no evidence of acute intracranial injury. Plaintiff was discharged from the hospital, with instructions to start taking Hydrocodone-acetaminophen 5-500 mg. tablet by mouth every 4 hours as needed for "pain, moderate."  Plaintiff was also instructed not to blow his nose, and told that he may apply ice for 10-20 minutes several times daily, and to use pain medication if needed. He was also instructed to follow up with his primary care physician.  Plaintiff testified that he was also told to elevate his head when he slept and to take the medicine as needed, and was given a list of symptoms to watch for and if he had any of them, he was to contact the doctor immediately.[2]

_____

[2]Plaintiff was given 30 days from the date of the hearing to provide the Court with this list of symptoms. Nothing was provided to the Court by Plaintiff subsequent to the hearing.

AO72A
(Rev. 8/82)

Some of those symptoms included numbness on one side of his body, stiff neck or trouble chewing. Plaintiff was not told he needed any further treatment regarding his fractures. After Plaintiff arrived back at the jail, he was taken to his cell and then to the medical pod, where he was given Tylenol before bed and an ice pack. Plaintiff was also given a mat to put under his head.

Plaintiff testified that on September 25, 2013, the day after he returned from the hospital, he asked about the ice pack, and began receiving it twice a day, and Tylenol three times a day. He was not, however, given the medication prescribed by the hospital, and when he asked about it, he was told he could not have narcotics in jail. According to Plaintiff, the Tylenol did not help with the pain. In a September 25, 2013 medical request, Plaintiff reported that he was starting to stutter more every day.

On September 26, 2013, Plaintiff again asked the nurses about the prescription pain medication that was prescribed by the hospital, and told them that the Tylenol and Aleve were not helping his face and neck pain. Nurse Watson said there was not anything she could do. On September 27, 2014, Plaintiff submitted a medical request, asking for a mat to sleep on the floor and an ice pack, because he was only getting one ice pack a day and two Aleve a day. Plaintiff further testified that on September 28, 2013, he submitted a medical request, stating that the right side of his face was numb. On September 29, 2014, Plaintiff submitted a medical request, stating that his vision had not improved and the Tylenol was not helping. Nurse Hartgraves saw Plaintiff, and he began getting Tylenol three times a day, but was not receiving the ice pack.

On October 3, 2013, Plaintiff submitted a medical request, requesting a mat to elevate his head because his mat had been taken. He thereafter received an extra pillow. On October 6,

-4-

2013, Plaintiff submitted another medical request, stating that the Tylenol and Ibuprofen were not helping with the pain, but had helped his headaches. Plaintiff inquired as to whether there was anything else he could take, and was put on the nurse call list. Nurse Watson saw Plaintiff on October 7, 2013, and noted that Plaintiff was not taking his medications as often as he should. Plaintiff testified that he had missed some morning medications because he was sleeping when they were offered. Plaintiff let Nurse Watson and Nurse Hartgraves know that the Tylenol was not helping the pain, and they said to take it for one month and they would see if they could put him on a different medication.

Subsequent to October 7, 2013, Plaintiff again asked for the medication prescribed by the hospital and for ice packs four times a day. Plaintiff was told that he only needed ice packs twice a day, and could not have the prescribed medication because it was a narcotic.

On October 11, 2013, Plaintiff complained that he had all of the symptoms he was told to watch for and also that he was supposed to eat soft food but had been eating hard food. Plaintiff was told to stay on the Tylenol and that they could not change his food.  Between October 11, 2013 and November 11, 2013, Plaintiff continued taking Tylenol and Aleve, and Plaintiff said he could not keep going to the nurse because they charged him every time he went.

Nurse Watson saw Plaintiff on November 22, 2014, and asked Plaintiff about his weight loss. She told Plaintiff to take Ibuprofen three times a day.

On November 26, 2013, Plaintiff asked for another pain reliever. Nurse Watson saw Plaintiff on November 27, 2013, and said he was not taking his medicine as often as he should. Plaintiff testified that the medication was not helping him, which is why he did not take it, and that he had tried taking it three times a day before and it did not help.

-5-

Plaintiff was released from BCDC on December 22, 2014, when he was bonded out. After release, Plaintiff sought further treatment at the Siloam Springs Hospital, complaining of back pain from the September 23 incident, and was prescribed hydrocodone. He testified he took this for both his back pain and face pain.

At the conclusion of the hearing, Plaintiff stated that he was suing Nurse Watson and Nurse Hartgraves because they were, in his eyes, "deliberately indifferent" toward him. He said they just told him to "suck it up" and "don't be a baby about it."  Plaintiff testified he was suing Deputy Jarnagan because he believes the deputy used excessive force when taking him to the ground to stop the fight.  Plaintiff testified he was suing the Benton County Detention Center because that is where the Defendants worked and there was a policy or custom of "lack of care" and excessive force. Plaintiff relies on the jail motto which said they would provide a "safe environment for inmates."

**B.    Defendants' Version:**

Defendants' version of the September 23rd incident is set forth in an incident report prepared by Defendant Jarnagan:

> On Monday, September 23, 2013, at approximately 1820, I, Deputy Jarnagan was assigned to D-Pod. I was entering pod control when I observed two inmates in D-153 fighting. Deputy Adams called for assistance while I entered the pod. I immediately ordered all inmates to get on the ground. The inmates looked at me but did not immediately respond. I approached the inmates who were fighting again ordering all inmates to get on the ground. Inmate Anderson, Marquise (OCA 108585) and Inmate Helms, Eric (OCA 35022) were later identified as the inmates that were fighting. Inmate Anderson was the closest inmate to me. Inmates Anderson and Helms were in the center of the front four tables as you entered the pod. They were clenched up with their heads together, punching each other with their free hands when I approached them. The other inmates had formed a ring on the outside of the tables to watch the fight. I ran between the gaps in the front tables to get to the fighting

-6-

inmates. Inmate Anderson was facing away from me and Inmate Helms was facing towards me. As I approached, Inmate Anderson broke contact with Inmate Helms and turned and faced me. Both of the fighting inmates still had their hands up in a guard and had their fists clenched. Neither Inmate was making an attempt to get on the ground as I was ordering. I gained control of Inmate Anderson by his shirt at his shoulders and placed him on the floor using a forward takedown. Due to Inmate Anderson's height, I stepped back with my left leg while taking him to the floor. Inmate Anderson made contact with the stool of one of the tables with his face on the way to the floor. Inmate Anderson was on the floor with his hands underneath him still supporting his weight. I gained control of his left hand and placed it in a wrist-lock behind his back. Inmate Helms went to the floor as well as the rest of the pod. I ordered Inmate Helms to place his hands behind his back, and he complied. At this time, Deputy Chavez entered the pod. I pointed him to Inmate Helms while I placed Inmate Anderson in handcuffs. Deputy Chavez placed Inmate Helms in handcuffs. Both inmates were removed from the pod. I took Inmate Anderson to the ministry room. I asked what had happened. Inmate Anderson stated that Inmate Helms was trying to get him to make a trade for his tray. He stated that he had traded with someone else and Inmate Helms was mad. Inmate Anderson stated that Inmate Helms was calling him names and making threats. He stated that he tried to walk away when Inmate Helms hit him. Inmate Anderson stated that after he was hit he began to fight back. I took Inmate Anderson to be seen by the nurse. Deputy Monday stayed with Inmate Anderson at the nurse station while I returned to my normal duties. The nurse said there was a small amount of swelling on Inmate Anderson's forehead and right cheek. She gave him an ice pack. I took pictures of the swelling. Later that evening, I spoke with Inmate Helms. He stated that Inmate Anderson had backed out of a deal to trade food with Inmate Helms. Inmate Helms stated that he had spoken to Inmate Anderson about it and Inmate Anderson had called him a bitch. Inmate Helms stated that Inmate Anderson said Inmate Helms would not do anything. Inmate Helms said they then got in a fight. After reviewing the camera, it was clear that Inmate Anderson had tried to walk away from the fight. Inmate Helms was locked down for A-2, Fighting, and Inmate Anderson was reduced to B-3. Failure to comply with a deputy's order in a timely manner.

(Doc. 36-1).

   Also presented to the Court were two videos of the incident, taken from different angles,

which the Court has carefully reviewed.

-7-

With regard to Plaintiff's medical care, Defendants provided the affidavit of Nurse Darla Watson, which indicates that on September 26, 2013, when she saw Plaintiff, Plaintiff said that he would like "more for pain" and told her he had been "stuttering" since his fight. Nurse Watson stated in her affidavit that she noted that she had visited with him five times since the fight in unguarded/less guarded moments and had seen no evidence of stuttering. (Doc. 43 at p.2). She also indicated that on November 22, 2013, she saw Plaintiff and asked him about his weight loss (he was overweight, but had lost 15 pounds in the two months since his intake), but he told her he exercised in his cell and that he did not care for the food at the jail.

Defendants also provided the affidavit of Nurse Gail Hartgraves, which indicated that she spoke with Plaintiff on numerous occasions after the altercation and never noticed any stuttering on his part. She also outlined the care she gave Plaintiff during the time period in question.

Defendants also provided the affidavit of Dr. Scott Lafferty, a physician for the Benton County Jail during the incident in question. (Doc. 44). In the affidavit, Dr. Lafferty stated that he did not see Plaintiff for a visit during his 2013 incarceration but provided care for him through the jail's medical staff and by referral. Dr. Lafferty indicated that on September 24, 2013, Nurse Watson contacted him and advised him that Plaintiff had been involved in an altercation and was presenting with raised areas and/or abrasions on his forehead and that he was complaining of facial numbness. Dr. Lafferty therefore ordered a CT of his head and face. Later that day, Dr. Lafferty was contacted by Nurse Hartgraves, who stated that Plaintiff was claiming a number of worsening symptoms, and Dr. Lafferty therefore ordered that Plaintiff be taken to the emergency room for his CT scans. Dr. Lafferty was next contacted on September 27, 2013,

-8-

by Nurse Watson, who indicated that Plaintiff was asking for something else for pain and that Plaintiff claimed to have been stuttering since the altercation. Dr. Lafferty told nurse Watson to discontinue the Aleve and change it to Tylenol, 3 times per day, as needed. Dr. Lafferty stated that he was contacted by Nurse Watson by text message on September 29, 2013, and she informed him that Plaintiff was complaining of broadening numbness in his face and upper chest. Dr. Lafferty then ordered the discontinuation of Tylenol and a change to Motrin, 3 times per day, as needed.

The next time Dr. Lafferty stated he was contacted by Nurse Watson was on November 22, 2013, when she reported that Plaintiff had complained of pain in his neck "from what he described as an old injury." Dr. Lafferty then ordered a change from Motrin to Ibuprofen, also 3 times per day, as needed. Dr. Lafferty was again contacted by Nurse Watson on November 27, 2013, with a report of Plaintiff's claimed neck pain. Nurse Watson advised Dr. Lafferty that Plaintiff had not been taking all available doses of his pain medications under his as needed/prn orders, so he changed his orders for Ibuprofen from as needed/prn to 3 times per day on a regular schedule. He received no further communication regarding Plaintiff prior to his release from the Benton County Jail in late December 2013.

Pursuant to the Court's request, Defendant submitted another affidavit of Dr. Lafferty on October 6, 2014 (Doc. 48). In that affidavit, Dr. Lafferty states that he made the decision not to fill the Lortab (hydrocone) prescription made by the ER physician at Mercy Hospital for Plaintiff. He further stated that although it was not charted, he knows that he made the decision not to fill the ER Lortab prescription because he made the same decision numerous times while serving as the county jail physician. He stated that, although he did not employ a no-narcotics

-9-

policy in the jail or in private practice, he does use them "quite sparingly." Dr. Lafferty notes that the prescription for hydrocodone was prescribed "as needed" for Plaintiff's self-reported "pain, moderate." Dr. Lafferty states that he does not generally prescribe narcotic pain reliever as a first resort for moderate pain, and that an "as needed" prescription implicitly assumes that the medication may not be needed.

Dr. Lafferty also noted that Plaintiff missed numerous doses of pain medication or slept through some of those medication calls, and generally, if a patient can sleep through the pain, the pain level is not severe enough to warrant narcotic pain relievers.

## II.   Applicable Standard:

"Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law." Uhiren v. Bristol-Myers Squibb Co., Inc., 346 F.3d 824, 827 (8th Cir. 2003). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce of El Dorado, Ark. v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Merge v. Boehler, 762 F.2d 621, 625 (8th Cir. 1985).

-10-

Plaintiff has sued the individual defendants in their individual and official capacities.

(Doc. 1 at p. 4).

III.    **Discussion:**

   **A.    Excessive Force Claim against Defendant Jarnagan in His Individual Capacity:**

"Because [Plaintiff] was a pretrial detainee at the time of the alleged violation of his constitutional rights, we analyze [his] claim against [Defendants] under the Fourteenth Amendment, rather than the Eighth Amendment." Morris v. Zefferi, 601 F.3d 805, 809 (8th Cir. 2010)(citations omitted).

> The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from the use of excessive force that amounts to punishment. Because the Due Process Clause prohibits *any* punishment of a pretrial detainee, be that punishment cruel-and-unusual or not, we ask whether the defendant's purpose in using force was to injure, punish or discipline the detainee.... Moreover, conduct that is merely negligent or grossly negligent does not implicate the protections of the Due Process Clause.

Jackson v. Buckman, 756 F.3d 1060, 1067 (8th Cir. 2014)(internal quotation marks and citations omitted).

The Due Process inquiry uses the objective reasonableness inquiry of the Fourth Amendment. Id. The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. Andrews v. Neer, 253 F.3d 1052, 1060-61, n.7 (8th Cir. 2001). The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. Id.

The Court has reviewed and considered the video of the incident in question, as well as the testimony of Plaintiff and the incident report prepared by Defendant Jarnagan.  It is clear

-11-

from the evidence that Plaintiff did not instigate the fight, but rather Inmate Helms did, and even after Plaintiff tried to walk away, Inmate Helms continued to provoke Plaintiff, and Plaintiff was forced to defend himself. It is noteworthy that Plaintiff is 6 feet tall and weighed 270 pounds at the time of the injury  (Doc. 36-2 at p. 16), and was visibly larger than Defendant Jarnagan. As Defendant Jarnagan approached the two fighting, and told everyone in the room to get on the ground, Plaintiff and Inmate Helms continued fighting. As Defendant Jarnagan approached Plaintiff, who was closest to him, Plaintiff had his fisted hands in front of him, and had failed to go to the ground as directed.  It was reasonable for Defendant Jarnagan to believe that, in order to stop the fight and prevent further harm or injury, he needed to overtake Plaintiff, and in doing so, it was necessary for Defendant Jarnagan to grab Plaintiff and put his weight behind him in order to take Plaintiff down to the floor. In so doing, Plaintiff accidentally hit his head on the way to the floor on a metal stool that was attached to a table. There is no indication that Defendant Jarnagan threw him into the metal stool deliberately, but rather he was just trying to get Plaintiff down on the ground and the metal stool happened to be in the way.  It is clear that it was not Defendant Jarnagan's purpose in using force with Plaintiff to injure, punish or discipline Plaintiff, but rather to stop the fight to prevent further harm or injury.

The Court therefore finds that Plaintiff's excessive force claim against Defendant Jarnagan in his individual capacity is without merit.

In any event, Defendant Jarnagan would be entitled to qualified immunity, as the facts, construed in the light most favorable to Plaintiff, do not establish a violation of a clearly established constitutional or statutory right of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 232 (2009); see Risdal v. Nixon, No. 13-2545, 2014 WL

5471985 at *2 (8th Cir. Oct. 30, 2014); <u>Morrow v. Kelley</u>, No. 5:13CV00098-SWW-JTR, 2014

WL 6845552 at *4 (E.D. Ark., Dec. 2, 2014).

> **B.** **Improper Medical Care by Nurse Hartgraves and Nurse Watson in Their Individual Capacities:**

Plaintiff's claims against Nurses Hartgraves and Watson are based upon his belief that

he was denied proper medical treatment for the injuries he suffered as a result of the incident in

question. "An official who is deliberately indifferent to a prisoner's medical needs is subject to

suit under § 1983." <u>McRaven v. Sanders</u>, 577 F.3d 974, 979 (8th Cir. 2009). The deliberate

indifference standard "has both an objective and subjective component." <u>Vaughn v. Gray</u>, 557

F.3d 904, 908 (8th Cir. 2009). It has been held that "[d]eliberate indifference to a prisoner's

serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment."

<u>Langford v. Norris</u>, 614 F.3d 445, 460 (8th Cir. 2010) (citations omitted). "To show deliberate

indifference, plaintiffs must prove an objectively serious medical need and that prison officials

knew of the need but deliberately disregarded it." <u>Id.</u> (citing <u>Crow v. Montgomery</u>, 403 F.3d

598, 602 (8th Cir. 2005). "Prisoners may prove deliberate indifference by showing that the total

deprivation of medical care resulted in 'pain and suffering' or 'a lingering death.'" <u>Langford</u>,

614 F.3d at 460, (citing <u>Estelle</u>, 429 U.S. at 103.

> But a total deprivation of care is not a necessary condition for finding a constitutional violation: "Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." <u>Smith v. Jenkins</u>, 919 F.2d 90, 93 (8th Cir. 1990)(citations omitted). To state a claim based on "inadequate medical treatment ... [t]he plaintiff 'must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" <u>Alberson v. Norris</u>, 458 F.3d 762, 765 (8th Cir. 2006)(quoting <u>Estate of Rosenberg v. Crandell</u>, 56 F.3d 35, 37 (8th Cir. 1995).

-13-

Langford, 614 F.3d at 460.

At the conclusion of the hearing, Plaintiff stated that he believed he received inadequate care from Nurse Watson and Nurse Hartgraves because in his eyes, they were "deliberately indifferent toward me." He also stated that he was not getting the treatment the hospital prescribed.

The records indicate, and Plaintiff's testimony confirms, that he did receive ice packs for his head, although not as often as he wanted, he did receive a mat or pillow for him to elevate his head, and he also received medications of Tylenol, Aleve, or Ibuprofen. He did not, however, receive any of the medication prescribed by the hospital - hydrocodone - as needed for pain. He also did not receive soft food.

The Court believes Plaintiff has failed to meet his burden of proving that the conduct of Nurses Watson and Hartgraves rose to the level of more than negligence or gross negligence, and believes it was more an issue of a mere disagreement with treatment decisions. Therefore, their conduct does not, in the Court's opinion, rise to the level of a constitutional violation. At most, Plaintiff may have not received as many ice packs as he might have wished or as were prescribed, and may have been required to eat hard food instead of soft food, but there was no indication that Plaintiff suffered as a result of eating hard food, and the Court cannot say this was enough to constitute a constitutional violation. In addition, the fact that Plaintiff did not receive the hydrocodone, although prescribed by the emergency room physician, appears to have been nothing more than a decision by Dr. Lafferty that Plaintiff's pain was not severe enough to warrant narcotic medication, especially in light of the fact that Dr. Lafferty was conservative in his approach to prescribing narcotics. Nurses Watson and Hartgraves were not responsible for

-14-

the fact that Plaintiff did not receive the narcotic medication.

Accordingly, the Court does not believe Plaintiff has met his burden of showing that Nurse Watson or Nurse Hartgraves were deliberately indifferent to his medical needs.

In any event, Defendants Hartgraves and Watson would be entitled to qualified immunity, as the facts, construed in the light most favorable to Plaintiff, do not establish a violation of a clearly established constitutional or statutory right of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. at 232; see Risdal, 2014 WL 5471985 at *2; Morrow, 2014 WL 6845552 at *4.

**C.      Claims against Defendants in Their Official Capacities and against Benton County:**

As Plaintiff has failed to state an underlying constitutional violation, his official capacity claims necessarily fail. See Jackson, 756 F.3d at 1067 n.3. Further, even if Plaintiff had established a constitutional violation, he has not established a basis for holding Defendants liable in their official capacities. Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, the official capacity claims are treated as claims against Benton County. See Murray v. Lene, 595 F.3d 868, 873 (8th Cir. 2010), cert.denied ___U.S.___, 131 S.Ct. 255 (2010). To establish Benton County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted). The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially

-15-

lawful municipal policy or custom was adopted with "deliberate
indifference" to its known or obvious consequences. <u>Seymour v. City of
Des Moines</u>, 519 F.3d 790, 800 (8th Cir. 2008). There need not be a
finding that a municipal employee is liable in his or her individual
capacity before municipal liability can attach. <u>Speer v. City of Wynne</u>,
276 F.3d 980 (8th Cir. 2002); <u>Parrish v. Luckie</u>, 963 F.2d 201, 207 (8th
Cir. 1992)("a public entity or supervisory official may be held liable
under § 1983 even though no government individuals were personally
liable."). Where an official policy is itself unconstitutional or directs
employees to take unconstitutional action, no evidence beyond a
statement of the policy and its exercise is necessary to establish § 1983
liability. <u>Szabla v. City of Brooklyn Park</u>, 486 F.3d 385, 389-90 (8th Cir.
2007).

<u>Id.</u> at 817-18.

In <u>Johnson v. Douglas County Medical Dept.</u>, 725 F.3d 825 (8th Cir. 2013), the Court

outlined the necessary elements for establishing the existence of an unconstitutional custom. It

stated:

To establish a claim for "custom" liability, [Plaintiff] must demonstrate:

1) The existence of a continuing, widespread, persistent pattern of
unconstitutional misconduct by the governmental entity's employees;
2) Deliberate indifference to or tacit authorization of such conduct by the
governmental entity's policymaking officials after notice to the officials
of that misconduct; and
3) That Plaintiff was injured by acts pursuant to the governmental
entity's custom, i.e., that the custom was the moving force behind the
constitutional violation.

<u>Id.</u>, 725 F.3d at 828 (citations omitted).

At the hearing, Plaintiff stated that there was a "lack of care policy" that existed and that

Defendant Jarnagan used excessive force. He also said he was suing Benton County for what the

three individuals did. Plaintiff failed to point to any policy, custom or pattern of unconstitutional

misconduct by Defendants or deliberate indifference or tacit authorization of any such conduct,

or that the custom was the moving force behind the alleged constitutional violation.

-16-

**IV.     Conclusion:**

For the reasons stated, the Court recommends that the summary judgment motion filed by Defendants **(Doc. 34)** be granted and this case be dismissed with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of December, 2014.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-17-